IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| EMPOWER AI, INC., | ) |
|     Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 1:24-cv-83 (RDA/WEF) ) |
| PAUL A. DILLAHAY, | ) ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Paul A. Dillahay's ("Dillahay" or "Defendant") Motion to Dismiss for Failure to State a Claim (Dkt. 2). This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Having considered the Motion together with Defendant's Memorandum in Support (Dkt. 3), Plaintiff Empower AI, Inc.'s ("Empower AI" or "Plaintiff") Opposition (Dkt. 6), and Defendant's Reply (Dkt. 9), this Court DENIES the Motion to Dismiss for the reasons that follow.

I.  BACKGROUND

A.  Factual Background[1]

Plaintiff Empower AI brings the instant breach of contract suit against its former Chief Executive Officer ("CEO"), alleging that Defendant used Plaintiff's confidential information and attempted to solicit one of Plaintiff's employees, Employee A, to join Plaintiff's direct competitor,

---

[1] For purposes of considering Defendant's Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

in breach of a Confidentiality Agreement and a Separation Agreement between them. Dkt. 1-3 ¶¶ 1, 64-71.

Empower AI, formerly known as NCI Information Systems ("NCI"), is a Virginia corporation that provides information technology ("IT") solutions and professional services to the federal government. *Id.* ¶¶ 11, 16. As its former CEO, Defendant had full access to all of Plaintiff's "confidential information, including information about key personnel, compensation, performance, and assignments, as well as Empower AI's trade secrets, business strategies, customer relations, and its strengths and weaknesses." *Id.* ¶ 28.

Defendant signed an Employment Agreement with NCI to begin serving as its CEO on April 25, 2018. *Id.* ¶ 22. A document entitled "Confidential Information, Non-Competition, and Non-Solicitation Terms" (the "Confidentiality Agreement") was annexed to the Employment Agreement. *Id.* ¶ 23; *see also id.* at 34, Ex. B. The terms of the Confidentiality Agreement "governed the confidentiality of NCI's property, trade secrets, and other work product, and also prohibited Dillahay from contacting or soliciting NCI personnel, suppliers, contractors, and other relevant parties during the effectiveness of the non-compete period." *Id.* ¶ 23. The non-compete period is "twelve (12) months following the date of" termination. *Id.* ¶ 25.

Specifically, Section (e)(ii) of the Confidentiality Agreement (the "Non-Solicitation Provision") provides, *inter alia*, that:

> During the Noncompete Period, [Defendant] covenant[s] and agree[s] that [Defendant] shall not, directly or indirectly through another Person, (i) contact, for a purpose which could reasonably be expected to adversely affect the resources or personnel available to [Plaintiff] . . . or otherwise interfere with . . . the business relationship between [Plaintiff] and any of its . . . employees; (ii) solicit or encourage any officer, employee, or consultant of [Plaintiff] . . . to leave the employment or service of [Plaintiff], or provide names or other information about [Plaintiff's employees] to any Person under circumstances which could reasonably be expected to lead to the use of that information for purposes of recruiting, hiring,

> soliciting, or encouraging any such [employee] to leave the employment or service of [Plaintiff][.]

*Id.* ¶ 27; *see also id.* at 37, Ex. B, § (e)(ii).  Meanwhile, section (c)(i) of the Confidentiality Agreement (the "Fiduciary Duty Provision") provides, *inter alia*, that:

> While employed by or providing services to the Company and thereafter, [Defendant] shall hold in a fiduciary capacity for the benefit of the Company and shall not directly or indirectly use or disclose, other than when required to do so in good faith to perform your duties and responsibilities, any Confidential Information[.]

*Id.* ¶ 67; *see also id.* at 35, Ex. B, § (c)(i).  Further, section (c)(ii) of the Confidentiality Agreement defines the term "Confidential Information" as follows:

> The term "Confidential Information" means any secret, confidential or proprietary information possessed by the Company relating to its businesses, including, without limitation, customer lists, details of client or consultant contracts, the terms and conditions of this [Confidentiality Agreement], current and anticipated customer requirements, pricing policies, price lists, market studies, business plans, licensing strategies, advertising campaigns, operational methods, marketing plans or strategies, product development techniques or flaws, computer software programs (including object code and source code), data and documentation, data base [*sic*] technologies, systems, structures and architectures, inventions and ideas, past, current and planned research and development, compilations, devices, methods, techniques, processes, financial information and data, employee compensation information, business acquisition plans and new personnel acquisition plans, which are not otherwise included in the definition of a Trade Secret under this [Confidentiality Agreement], and that has not become generally available to the public by the act of one who has the right to disclose such information without violating any right of the Company.

*Id.* at 35, Ex. B, § (c)(ii).

On February 14, 2023, Plaintiff terminated the employment of Defendant for reasons unrelated to this case.  *Id.* ¶ 29.  Upon termination, Plaintiff and Defendant entered into a Separation Agreement and General Release (the "Separation Agreement") on February 14, 2023. *Id.* ¶ 30.  In consideration for Defendant executing the Separation Agreement and complying with its terms and restrictions, Plaintiff agreed to:

3

> a. Pay [Defendant] $23,215, representing his pro-rated salary for the period between his termination date and the end of February 2023[;]
> b. Pay [Defendant] $555,000, representing a year's worth of his salary while employed as [Plaintiff]'s CEO[;]
> c. Pay [Defendant] $300,000, representing his target annual performance-based bonus for calendar year 2023[;]
> d. Reimburse [Defendant]'s COBRA premium payments until the earlier of 18 months after the terminate date, [Defendant]'s breach of the Separation Agreement, or Dillahay's employment elsewhere[;]
> e. Maintain [Defendant] on [Plaintiff]'s life insurance coverage[.]

*Id.* ¶ 31; *see also id.* at 40, Ex. C, § 3(a)-(e).

The Separation Agreement incorporates the Confidentiality Agreement into its terms as "the Surviving Provisions." *Id.* at 43, Ex. C, § 7 ("collectively, all of Employee's continuing obligations under the Employment Agreement and Confidentiality Agreement, the 'Surviving Provisions'"). It specifies that Defendant agreed to be continuously bound by the terms of the Confidentiality Agreement, including the Non-Solicitation Provision and the Fiduciary Duty Provision, during the Noncompete Period. *Id.* ¶ 32; *see also id.* at 43, Ex. C, § 7 ("Employee acknowledges and agrees that Sections 11 and 12 of the Employment Agreement and the Confidential Information, Non-Competition, and Non-Solicitation Terms . . . shall remain in full force and effect . . . following the Termination Date.").

The Separation Agreement also provides that, upon Defendant's breach of the Separation Agreement or the Confidentiality Agreement, Plaintiff would be released from all its obligations to Defendant and would be entitled to recoupment of all amounts paid to Defendant following his termination, including attorneys' fee. *Id.* ¶ 33.

> Should Employee breach this Agreement or any of the Surviving Provisions, then: (a) the Company shall have no further obligations to Employee under this Agreement or otherwise (including, but not limited to, any obligation to provide or to continue to provide the consideration set forth in Paragraph 3 of this Agreement); (b) the Company shall be entitled to recoup the amount of the payment(s) Employee received pursuant to this Agreement, plus the reasonable attorneys' fees and costs the Company incurs in recouping such amounts . . . .

4

*Id.* at 44, Ex. C, § 11.

After his departure in February 2023, Defendant sent a series of text messages to Employee A in August 2023, stating that he would like to introduce them to someone who had an "interesting opportunity" for them. *Id.* ¶¶ 35, 39. Employee A is the program manager for a four-year, 269.9-million-dollar contract (the "JSP Contract") that Plaintiff was awarded while operating as NCI in 2019. Under the JSP Contract, Plaintiff provides IT support to the Defense Information Systems Agency's Joint Service Provider (the "JSP"). *Id.* ¶¶ 18-20. As program manager, Employee A acts as the lead personnel in charge of the JSP Contract and plays a key role in renewing such contracts. *Id.* ¶¶ 36-37. The solicitation process for the subsequent JSP contract was expected to begin in January 2024. *Id.* ¶ 21.

Unaware of any further details at the point, Employee A responded to Defendant's text that they were interested in learning more about the opportunity. *Id.* ¶ 40. Defendant then provided Employee A's contact information to Julian Setian, President and CEO of SOS International ("SOSi"). *Id.* ¶ 41. SOSi, a government contractor, is a competitor of Plaintiff in providing IT infrastructure services to federal agencies. *Id.* ¶¶ 42-43. SOSi was also interested in the JSP Contract and was already "working with former employees of Plaintiff in pursuit of the JSP Contract at the next solicitation cycle." *Id.* ¶¶ 43-45.

Mr. Setian introduced himself to Employee A after receiving their contact information. *Id.* ¶ 46. He then introduced Employee A to SOSi's business development and human resources personnel (the "SOSi Employees"). *Id.* ¶ 47. In September 2023, the SOSi Employees invited Employee A to lunch, and Employee A agreed to go to lunch. *Id.* ¶ 48. Employee A quickly became aware during the lunch that the purpose "was to recruit them to SOSi, particularly as part of SOSi's efforts to bid on and secure the JSP Contract." *Id.* ¶ 49. Experiencing discomfort,

Employee A told the SOSi employees that they had no interest in leaving Plaintiff to work for SOSi. *Id.* ¶ 51.

The SOSi Employees and Mr. Setian attempted to contact Employee A several times after the lunch, but Employee A did not respond. *Id.* ¶ 52. Employee A also spoke with Defendant to express his discomfort surrounding the situation Defendant had put them in. *Id.* ¶ 53. On or about October 31, Employee A informed Plaintiff's senior management about the actions of Defendant and SOSi. *Id.* ¶54.

On November 17, 2023, Plaintiff's counsel sent Defendant a letter seeking confirmation "that he has immediately ceased all activity in breach of the Separation Agreement and that he would honor his obligations in the Confidentiality Agreement." *Id.* ¶ 55; *see also id.* at 47-48, Ex. D. On November 20, 2023, Defendant responded, stating that he "fully intend[s] to abide by the terms of [the] Separation Agreement and General Release" and, after reviewing the Confidentiality Agreement, "will honor these obligations." *Id.* ¶ 56; *see also id.* at 49-50, Ex. E.

After receiving the letter from Plaintiff's counsel, Defendant contacted several of Plaintiff's employees. *Id.* ¶ 57. First, Defendant called Employee A to ask whether they had told Plaintiff about the communications between Defendant and Employee A. *Id.* ¶ 58. Defendant also stated during that conversation that he had not solicited or tried to recruit Employee A, and "that all he did was to 'introduce' Employee A to Mr. Setian and SOSi." *Id.* Defendant then called Plaintiff's Defense Business Unit General Manager and Plaintiff's Chief Financial Officer. *Id.* ¶¶ 59-60. Plaintiff claims that the purpose of these conversations was to figure out who informed Plaintiff about his alleged solicitation of Employee A. *Id.*

In the instant suit, Plaintiff alleges that Defendant solicited Employee A and used confidential information, which he gleaned while serving as Plaintiff's CEO, during his solicitation

of Employee A and his calls to other employees of Plaintiff to inquire about who informed Plaintiff about the alleged solicitation. *Id.* ¶¶ 4, 61. Plaintiff alleges that, in doing so, Defendant breached Sections (c)(i) (the Fiduciary Duty Provision) and (e)(ii) (the Non-Solicitation Provision) of the Confidentiality Agreement, as well as Section 7 of the Separation Agreement, which incorporates the Confidentiality Agreement. *Id.* ¶ 69.

### B. Procedural Background

On December 27, 2023, Plaintiff filed its initial Complaint in the Circuit Court for Fairfax County, Virginia. Dkt. 1-3 at 3. The case was removed to this Court on January 17, 2024. Dkt. 1. On January 22, 2024, Defendant filed the instant Motion to Dismiss and the accompanying Memorandum in Support. Dkt. Nos. 2, 3. Plaintiff filed its Opposition to Defendant's Motion to Dismiss on February 5, 2024. Dkt. 6. Defendant filed his Reply on January 12, 2024. Dkt. 9.

## II. STANDARD OF REVIEW

To survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard is not a probability requirement, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). However, "the court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th

Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). Nevertheless, courts may consider . . . documents attached to the complaint . . . 'so long as they are integral to the complaint and authentic.'" *Hugler v. Vinoskey*, No. 6:16-cv-00062, 2017 WL 1653725, at *5 (W.D. Va. May 2, 2017) (quoting *Phillips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (explaining that courts "may consider documents . . . attached to the motion to dismiss, as long as they are integral to the complaint and authentic").

### III. ANALYSIS

In his Motion to Dismiss, Defendant argues that Plaintiff's Complaint should be dismissed because Plaintiff does not state a valid breach-of-contract claim. First, Defendant contends that Plaintiff fails to plead that Plaintiff incurred pecuniary damages with sufficient specificity to support its breach-of-contract claim. Dkt. 3 at 4-5. Instead, Defendant asserts that Plaintiff's alleged damages are uncertain and speculative at best. *Id.* at 5. Second, Defendant contends that, even if Plaintiff were to prove damages, the Complaint should still be dismissed because it does not properly allege a breach of the Fiduciary Duty Provision of the Confidentiality Agreement. *Id.* at 5-8. Defendant argues that there was no breach of fiduciary duty because there are no allegations in the Complaint that Defendant disclosed any Confidential Information as defined in the Confidentiality Agreement. *Id.* at 7. Finally, Defendant contends that the Non-Solicitation Provision is unenforceable because the Provision is unreasonably restrictive and against public policy. *Id.* at 8.

In a diversity case, the Court must apply the law of the forum in which the claim arises. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The parties agree that Virginia law controls this proceeding. As such, this Court is bound by interpretations of Virginia law promulgated by the Supreme Court of Virginia. *See, e.g.*, *Toghill v. Clarke*, 877 F.3d 547, 558 (4th Cir. 2017) ("When construing the state law, we are bound by the construction given to it by the state court.") (cleaned up).

Under Virginia law, "[t]o survive a motion to dismiss for failure to state a breach of contract claim, the complaint must state sufficient facts showing: '(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendants' violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of the obligation.'" *Wenzel v. Knight*, No. 3:14-cv-432, 2015 WL 3466863, at *4 (E.D. Va. June 1, 2015) (quoting *Filak v. George*, 267 Va. 612, 619 (E.D. Va. 2004)). At this stage, the Court accepts all well-pleaded allegations as true.

Taking Plaintiffs' allegations as true, this Court finds that Plaintiff has pleaded sufficient facts to support a breach of contract claim at this stage of the proceedings.

### A. Legally Enforceable Obligation

The Court first determines whether Plaintiff plausibly alleges that Defendant was under any legally enforceable obligation with respect to Plaintiff. "A legally enforceable obligation, or contract, requires that there be 'acceptance of an offer . . . as well as valuable consideration.'" *Eplus Tech., Inc. v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 758 (E.D. Va. 2005) (quoting *Montagna v. Holiday Inns, Inc.,* 221 Va. 336, 346 (1980)). For a contract to be enforceable, "there must be mutual assent of the contracting parties in terms reasonably certain under the

9

circumstances." *Allen v. Aetna Cas. & Sur. Co.*, 222 Va. 361, 364 (1981). Here, Defendant accepted various forms of severance payment – consideration – in exchange for his adherence to the terms of the Separation Agreement, which incorporated the Non-Solicitation and Fiduciary Duty Provisions of the Confidentiality Agreement. *See Escgov, Inc. v. BMC Software, Inc.*, No. 1:13-cv-1344, 2014 WL 3891660, at *5 (E.D. Va. Aug. 7, 2014) ("Where a promisor receives and accepts, in exchange for his promise, 'something which he was not previously entitled to receive,' it is 'adequate consideration to support the promise'" (quoting *Richmon Eng'g & Mfg. Corp. v. Loth*, 135 Va. 110, 156 (Va. 1923))), *aff'd*, 597 F. App'x 181 (4th Cir. 2015). Defendant does not contest the enforceability of the Fiduciary Duty Provision. Instead, Defendant's enforceability challenge is focused solely on the Non-Solicitation Provision, arguing that the provision is unreasonably restrictive and against public policy. Dkt. 3 at 8-9. However, Defendant's facial challenge of the Non-Solicitation Provision is premature.

Under Virginia law, "restraints on competition are neither enforceable nor unenforceable in a factual vacuum," and a court shall examine the enforceability of restrictive covenants "[b]ased on evidence presented." *Assurance Data, Inc. v. Malyevac*, 286 Va. 137, 144-45 (Va. 2013) ("An employer may prove a seemingly overbroad restraint to be reasonable under the particular circumstances of the case."). Several courts have interpreted *Assurance Data* as heavily disfavoring facial challenges to restrictive covenants at the motion to dismiss stage, if not categorically barring such challenges. *See Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, No. 3:19-cv-153, 415 F.Supp.3d 703, 715 (E. D. Va., 2019) (stating that "Virginia law dictates that the party seeking to enforce a restrictive covenant must be allowed to 'present evidence to demonstrate the reasonableness of the restrictive covenant'"); *see also Neustar, Inc. v. Rapp*, No. 1:18-cv-478, 2019 WL 11232181, at *2 (E. D. Va., 2019) (explaining that the restrictive covenants in the

employment contract "are best construed after some factual development so that a reviewing court may determine the reasonableness of the covenants in light of the circumstances of this particular case"); *Southern Trust Mortgage, LLC v. Carson*, No. 2:22-cv-245, 2023 WL 3922623, at *5 (E. D. Va., 2023) ("[C]ourts in the Eastern District of Virginia have relied on the analysis in *Assurance Data* to deny motions to dismiss breach of contract claims under Rule 12(b)(6) because restrictive covenants should be construed after factual development.").

In Reply, Defendant cites to *Reading & Language Learning Center v. Sturgill*, 94 Va. Cir. 94 (Va. Cir. Ct. 2016), which is one of the few post-*Assurance Data* cases where the trial court declared a restrictive covenant to be facially invalid at the demurrer stage. Dkt. 9 at 8. However, this Court finds the reasoning in *Eagle Paper International, Inc. v. Continental Paper Grading Company*, No. 2:23-cv-512, 2024 WL 1328317, at *4 (E.D.Va. 2024), to be persuasive in distinguishing *Sturgill*. First, as stated in *Eagle Paper*, the *Sturgill* Court's ruling on the enforceability of restrictive covenants at this procedural posture "does not compel the court to make the same finding here." *Id*. Second, the *Sturgill* Court was able to rule on the merits of the restrictive covenant because the complaint there specified the justification for the restrictive covenants. *Id*. In this case, Plaintiff did not specify its justification for the Non-Solicitation Provision in the Complaint, and ruling on the merits of the Non-Solicitation Provision would therefore be premature at the current stage in which the Court is bound by the Complaint.

B. Breach of Fiduciary Duty and the Non-Solicitation Provisions

Upon establishing a legally enforceable obligation of the defendant, a plaintiff must then establish that defendant breached that duty. *See Filak v. George*, 267 Va. 612, 619 (E.D. Va. 2004). Defendant argues that Plaintiff fails to plausibly allege that he breached the Fiduciary Duty

Provision because Plaintiff does not specify what kind of Confidential Information was used or disclosed by Defendant in the alleged solicitation of Employee A. Dkt. 3 at 5-8.

This Court finds that Plaintiff has stated a plausible breach of the Fiduciary Duty Provision. The Confidentiality Agreement first defines Confidential Information broadly as "any secret, confidential or proprietary information possessed by the Company relating to its businesses" and follows this definition with a list of examples with the qualification that the list is "without limitation." Dkt. 1-3 at 35, Ex. B, § (c)(ii). ("any secret, confidential or proprietary information . . . including, without limitation . . ."); *see In re Vulcan Materials Co.*, 645 F.3d 249, 258 (4th Cir. 2011) (explaining that where text "specifically indicates that the enumerated factors 'include' but 'are not limited to' those listed . . . the list is neither exhaustive nor exclusive."). Among the types of information listed are details of client or consultant contracts, business plans, operational methods, and employee compensation information. *Id.* The Confidential Information that Plaintiff alleges Defendant used in attempting to solicit Employee A, who is the program manager for the JSP Contract, plausibly falls under these categories or closely related categories. For instance, Plaintiff states that Defendant had access to "information about key personnel, compensation, performance, and assignments," *id.* ¶ 28, which aligns with the Agreement's inclusion of information related to contracts, business operations, and employee compensation. Plaintiff further alleges that "[w]ithout access to Empower AI's confidential information when serving as Empower AI's CEO, Dillahay would not have known how to go about soliciting this specific employee." Dkt. 1-3 ¶ 4. Drawing "all reasonable inferences" in favor of Plaintiff, as required at this stage of the proceedings, *Kolon Indus., Inc.,* 637 F.3d at 440, it is plausible that the alleged confidential information at issue is Defendant's knowledge about Employee A's role, compensation, and performance as program manager for the JSP Contract, which could fall under

the categories of details of consultant contracts, business plans, operational methods, and employee compensation information.

In its Opposition, Plaintiff emphasizes that "Defendant's access to Empower AI's Confidential Information afforded him knowledge about Employee A's role and performance" and allowed him to know "*why* Employee A was the right person to solicit, and the optimal approach to try to successfully recruit Employee A . . . to a direct competitor." Dkt. 6 at 9. While the Complaint may not be as straightforward, it is well-established that "[a] plaintiff need not plead all the specific details underlying an alleged breach of contract to state a claim." *Castillo-Gomez v. Convenience Car Care Ctr., Inc.*, No. 1:14-cv-651, 2014 WL 3544839, at *2 (E.D. Va. July 17, 2014). Given the Agreement's broad definition of "Confidential Information" and the allegations presented in the Complaint, the Court finds that it is reasonable to infer that Defendant's solicitation of Employee A relied on protected Confidential Information, including knowledge of Employee A's specific role and performance as the program manager of the JSP Contract. This Court therefore finds that Plaintiff has plausibly alleged that Defendant breached the Fiduciary Duty Provision by using Confidential Information to solicit Employee A.

Regarding the alleged breach of the Non-Solicitation Provision, Defendant's Motion opts for a facial challenge of that Provision and does not contend that Plaintiff fails to plausibly allege a breach of the Non-Solicitation Provision. Dkt. 3 at 8-9. This Court will briefly address this issue. The Non-Solicitation Provision provides that Defendant shall not "provide names or other information about [Plaintiff 's employees] to any Person under circumstances which could reasonably be expected to lead to the use of that information for purposes of recruiting, hiring, soliciting, or encouraging any such [employee] to leave the employment or service of [Plaintiff]." Dkt. 1-3 ¶ 27; *see also id.* at 37, Ex. B, § (e)(ii). According to Plaintiff, Defendant provided the

13

contact information of Employee A to SOSi's CEO and contacted Employee A to introduce them to the SOSi Employees. *Id.* ¶¶ 39, 41. SOSi, one of Plaintiff's direct competitors, then sought to recruit Employee A. *Id.* ¶ 49. Accepting Plaintiff's allegations as true, the Court finds that Plaintiff has sufficiently alleged that Defendant breach the Non-Solicitation Provision.

### C. Damages

Finally, a plaintiff must demonstrate that it suffered injury or damages, and that the injury flowed directly from the defendant's breach. Defendant asserts that Plaintiff failed to allege damages because Plaintiff did not suffer any actual injury from the alleged solicitation. Dkt. 3 at 5. According to Defendant, Plaintiff's claim that Defendant's alleged breach "threatened" its business is speculative because Plaintiff "did not lose out on the JSP Contract, and it still employs Employee A to this day." Defendant further contends that Plaintiff does not claim the severance payments to be an injury caused by the alleged breach. *Id.*

"Proof of damages is an essential element of a breach of contract claim, and failure to prove that element warrants dismissal of the claim." *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 156 (Va. 2009) (citing *Filak*, 267 Va. at 619-20). "Damages based on uncertainties, contingencies, or speculation cannot be recovered." *Shepherd v. Davis*, 265 Va. 108, 125 (Va. 2003) (citing *Barnes v. Graham Va. Quarries, Inc.*, 204 Va. 414, 418 (Va. App. 1963)). This Court finds that Plaintiff has sufficiently alleged damages.

In support of his argument, Defendant relies on *Kamlar Corp. v. Haley*, 224 Va. 699, 705 (1983), for the proposition that "damages for breach of contracts are limited to the pecuniary loss sustained." But in *Kamler*, the Supreme Court of Virginia was examining whether a party could be awarded *punitive* damages in addition to compensatory damages "for breach of a purely contractual duty." *Id.* at 701. In reaching the conclusion that punitive damages are not appropriate

in the breach of contract context, the *Kamler* Court explained that damages for breach of contract "are within the contemplation and control of the parties in framing their agreement." *Id.* at 706.

Here, Plaintiff's theory of damages stems from the language of the Separation Agreement. Plaintiff seeks to recoup the severance payments it made to Defendant for his breach of the Non-Solicitation and Fiduciary Duty Provisions, as well as attorneys' fees. Dkt. 1-3 ¶ 63. Plaintiff provided the severance package "in consideration for Dillahay executing the Separation Agreement and complying with its terms and restrictions." *Id.* ¶ 31. Such language is also reflected in the Separation Agreement, which Defendant reviewed and signed. *Id.* at 40, Ex. C, § 3 ("In consideration for [Defendant] timely executing . . . this Agreement . . . and for complying with this Agreement and with the Surviving Provisions, . . . the Company agrees to pay or provide to Employee the Severance Payments"). The Separation Agreement further provides that, in the case of a breach, Plaintiff "would be entitled to recoupment of all amounts paid to Defendant following his termination, including attorneys' fees." *Id.* ¶ 33; *Id.* at 44, Ex. C, § 11. Plaintiff performed its obligations under the Separation Agreement and would forfeit the severance payments made if it is not allowed to recover that payment following Defendant's alleged breach of the Confidentiality Agreement during the Noncompete Period. Courts recognize that payments made to secure non-compete agreements can constitute damages. *See, e.g.*, *NCMIC Fin. Corp. v. Artino,* 638 F. Supp. 2d 1042, 1075 (S.D. Iowa 2009), *modified*, No. 4:07-cv-00204-JEG, 2009 WL 10669611 (S.D. Iowa Nov. 10, 2009) ("[Plaintiff] has already performed under the contract based on their expectation that [Defendant] would not compete against [Plaintiff], which means [Plaintiff] will have forfeited the $191,250 in severance payments if it is not allowed to recover those damages. There is no way for [Defendant] to cure this breach except through returning the severance payments."); *NRG Energy, Inc. v. Fuchs*, 572 F. App'x. 530, 532-33 (9th Cir. 2014)

15

(affirming grant of summary judgment to Plaintiff Company that alleged that it suffered monetary damage in the form of a severance payment when Defendant Employee breached the severance agreement between them).

Plaintiff has therefore plausibly alleged damages to survive the motion to dismiss stage. *See Job v. Simply Wireless, Inc.*, 160 F. Supp. 3d 891, 900 n.10 (E.D. Va. 2015) ("If discovery produces no basis for any damages stemming from the breach, then defendants will have a valid argument on the merits, but at the motion to dismiss stage the general allegation that plaintiffs have suffered damage is sufficient for the claim to survive.").

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 2) is DENIED.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
September 30, 2024

/s/
Rossie D. Alston, Jr.
United States District Judge